[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 09, 2001
THOMAS K. KAHN
CLERK

————————————————

No. 99-13479

————————————————

D. C. Docket No. 97-00031-7-CIV-HL

WILLIAM HOWARD PUTMAN,

Petitioner-Appellant,

versus

FREDERICK J. HEAD,

Respondent-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Georgia

————————————————
**(October 9, 2001)**

Before BLACK, HULL and WILSON, Circuit Judges.

BLACK, Circuit Judge:

Appellant William Howard Putman was convicted of two counts of murder and sentenced to death for each count on September 17, 1982, in Cook County, Georgia. On April 22, 1997, Appellant filed, pursuant to 28 U.S.C. § 2254, a federal petition for a writ of habeas corpus, challenging his Cook County convictions and sentences as constitutionally infirm. The district court denied the petition. *See Putman v. Turpin*, 53 F. Supp. 2d 1285 (M.D. Ga. 1999). On September 10, 1999, Appellant filed the instant appeal. We affirm.

## I. ISSUES FOR REVIEW

As this appeal was initiated after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. *See Slack v. McDaniel*, ___ U.S. ___, 120 S. Ct. 1595, 1600 (2000). As amended by AEDPA, 28 U.S.C. § 2253(c)(1) mandates that a habeas petitioner obtain a certificate of appealability (COA) in order to take an appeal. To gain a COA, a petitioner must make "a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Furthermore, in granting a COA, a court must specify on which issues the petitioner has made the requisite showing. *See* 28 U.S.C. § 2253(c)(3); *Peoples v. Haley*, 227 F.3d 1342, 1345 (11th Cir. 2000). Here, the district court granted a COA, but failed to specify the appropriate issues pursuant to § 2253(c)(3).

2

The district court's failure to enumerate the issues for appellate review does not deprive us of jurisdiction.  *See Haley*, 227 F.2d at 1346 (citing *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000), *cert. denied* ___ U.S. ___, 121 S. Ct. 1738 (2001)).  Rather, in exercising our discretion, we may either remand to the district court with instructions to enumerate the issues, or we may rule which issues raised by the petitioner warrant a COA.  *See id.*  In this case, we choose to decide ourselves which issues, if any, are worthy of a COA.

In his brief, Appellant raises the following issues:   (1) for both the guilt/innocence and sentencing phases of the trial, whether Appellant's right to due process was denied by the prosecutor's alleged failure to disclose exculpatory material;[1] (2) for the guilt/innocence phase of the trial, whether Appellant was denied effective assistance of counsel;[2] and (3) for the sentencing phase of the trial,

---

[1] Appellant's claims under this issue are based on *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).  In particular, Appellant alleges the following items were material and withheld by the prosecution: (1) a portion of a summary of Appellant's interview with a state psychologist, (2) a report about a caller claiming that other persons had seen a blonde man commit the murders, (3) information that, while Appellant was incarcerated,  witness Dessie Harris told agents she had seen the murderer in a Michigan rest stop, (4) a statement by witness Beverly Culvery, the niece of the victims, that the murderer called her aunt, Katie Christine Back, by the name "Christine," and (5) information that one of the arresting police officers lied about where precisely he found Appellant's gun in the truck.

[2] Appellant's claims under this issue are based on *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).  In particular, Appellant argues (in

3

whether Appellant was denied effective assistance of counsel. After reviewing the

record and the well-reasoned opinion of the district court, *see Putman*, 53 F. Supp.

2d at 1298-1301, 1304-10, we conclude that, for the first two issues, Appellant has

failed to make a substantial showing of a denial of a constitutional right and is not

entitled to a COA.[3] For the third issue, Appellant has made the necessary

approximately three pages of his initial brief) that trial counsel acted ineffectively by: (1) failing, at the suppression hearing, to attack the reliability of witness Brad Back (the victims' six-year-old child), thereby waiving any challenge to the probable cause underlying Appellant's arrest and the evidence gained therefrom; (2) failing to challenge the identification testimony of the three eyewitnesses; (3) failing to investigate the family's landlord, whom Brad Back initially identified as the assailant; (4) failing to discover or investigate the fact that Beverly Culver, the niece of the victims, told investigators that the murderer called her aunt, Katie Christine Back, by the name "Christine"; (5) failing to challenge the physical evidence (the blood on Appellant's pants and the dent on William Hodges' car); (6) failing to interview out-of-town prosecution eyewitnesses prior to trial; (7) failing to object to the prosecution's alleged comment on Appellant's post-arrest silence; (8) failing to introduce evidence that others had a motive to kill William Hodges; (9) failing to introduce evidence that fingerprints, tire tracks, and footprints at the scene of William Hodges' murder did not match those of Appellant; (10) failing to introduce evidence that witnesses saw a white van leaving the scenes of both crimes; and (11) making imprudent comments during opening and closing statements.

[3] With respect to the first issue, Appellant raises five *Brady* claims. *See supra* note 1. After holding an evidentiary hearing, the state habeas court, in its order dated July 1, 1994, rejected six *Brady* claims, including the five raised here. *See infra* note 4.

Appellant's fifth claim, alleging police fabrication about the location of the gun, was rejected by the state habeas court as being procedurally barred under Georgia law. *See* O.C.G.A. § 9-14-51. Appellant has shown neither cause and

substantial showing.  We grant a COA on the third issue and address only that issue in this opinion.

## II.  BACKGROUND

In the early morning hours of July 10, 1980, three murders occurred in the vicinity of Interstate 75 in south central Georgia.  One murder occurred in the

---

prejudice nor a fundamental miscarriage of justice.  Therefore, we are precluded from considering this claim.  *See, e.g., Mincey v. Head*, 206 F.3d 1106, 1135-36 (11th Cir. 2000) (citing *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2564-65 (1991)), *cert. denied* ___ U.S. ___, 121 S. Ct. 1369 (2001).

The state habeas court rejected the other four claims on the merits.  In doing so, the court made factual findings crediting the testimony of Appellee's witnesses.  On each claim, the court concluded Appellant had failed to show  Appellee possessed the alleged exculpatory materials. In addition, on the first two claims (concerning the summary of the psychologist's interview and reports about a blonde-hair killer), the court concluded Appellant could not show prejudice as required by *Brady*.  Appellant has not shown, by clear and convincing evidence, the factual findings of the state habeas court were incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Furthermore, the legal conclusions of the state habeas court were neither contrary to, nor an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

With respect to the second issue, Appellant raises 11 *Strickland* claims.  *See supra* note 2.  These claims are without merit.  As we discuss below, the evidence showing Appellant's guilt was overwhelming.  *See infra* Part II.A.  Assuming *arguendo* that trial counsel's actions and omissions constituted deficient performance, Appellant has utterly failed to show that, but for these alleged deficiencies, there is a reasonable probability the jury would have found Appellant not guilty.  This failure to show prejudice dooms Appellant's ineffective assistance claims for the guilt/innocence phase of the trial.  *See Strickland*, 466 U.S. at 694, 700, 104 S. Ct. at 2068, 2071.

parking lot of a truck stop in Valdosta, Lowndes County. The other two murders occurred at a rest area near Lenox, Cook County, which lies north of Lowndes County. Eventually, the state of Georgia prosecuted Appellant, a truck driver, for all three murders.

Georgia conducted two separate trials for the three murders—one trial for the single murder in Lowndes County and another trial for the two murders in Cook County. At both trials, the prosecution presented substantial evidence about all three murders. The juries found Appellant guilty of all three murders. But at the first (Lowndes County) trial, the jury sentenced Appellant to life imprisonment, whereas at the second (Cook County) trial, the jury sentenced Appellant to death. The instant petition challenges the Cook County conviction and sentence.

While Appellant had the same lead counsel at both trials, the other members of his legal team changed between proceedings. Appellant's primary contention—and the only one for which we have granted a COA—is that his Cook County legal team rendered ineffective assistance of counsel during the sentencing phase. In a nutshell, Appellant argues the failure of his Cook County lawyers to adhere to the sentencing strategy of his Lowndes County lawyers constituted deficient legal assistance, and but for this deficiency, there is a reasonable probability Appellant would not have been sentenced to death.

To fully explore Appellant's contention, we must detail the facts underlying all three murders and the facts related to Appellant's legal representation at both trials —even though, to reiterate, the instant petition challenges only the Cook County judgment. Thus, in this part of the opinion, we first set forth the facts surrounding the three murders. Then, we explain the procedural history of the instant petition. Lastly, we factually compare the Lowndes County sentencing phase and the Cook County sentencing phase, focusing on the representation Appellant received at each proceeding.

A.     Factual Background of Appellant's Convictions

The facts underlying Appellant's convictions are thoroughly set forth in the Supreme Court of Georgia's opinion denying Appellant's direct appeal. *See Putman v. State*, 308 S.E.2d 145, 147-48 (Ga. 1983), *quoted in Putman*, 53 F. Supp. 2d at 1290-92. We repeat those facts here:

> In the early morning hours of July 10, 1980, David Hardin and his wife Katie [Christine Back], residents of Kentucky, were shot to death at an Interstate 75 rest area near Lenox, Georgia. Truck driver [and Appellant] William Howard Putman was arrested and charged with two counts of murder. . . .
>
> The victims spent the week preceding their deaths vacationing in Daytona Beach with their three children and David's niece Beverly Culver. They left Daytona Beach in their blue Dodge sedan on the evening of July 9 and arrived at the Lenox rest area some time prior to 3:00 a.m. on the tenth. They parked in the automobile parking lot of the rest area and went to sleep.

7

Later arrivals at the rest area included Verlin Colter, who parked two spaces to the right of the Hardins, and Dessie Harris, who parked across the drive-through, opposite the Hardin automobile.

Dessie testified that, upon her arrival, she spread a blanket on the hood of her car. As she sat on the blanket, smoking a cigarette, she observed a dark-colored "semi," pulling a flat-bed trailer, drive slowly several times through the automobile parking lot. The truck eventually parked at the end of the parking lot. The driver got out, reached into the cab of the truck, retrieved an object and walked toward her car. He stopped under a nearby tree, approximately five feet from Dessie, and whistled at her. She stared at him but said nothing. The man then walked behind her car and proceeded across the parking lot. He went around to the front of the Hardin automobile and stood there for a few moments.

In the meantime, Verlin Colter arrived and parked. He observed that a dark-colored semi with an empty, yellow flat-bed trailer was parked at the end of the automobile parking lot and that a man was standing in front of the blue Dodge, whose occupants were all apparently asleep.

Dessie testified that the man walked around to the driver's side of the Hardin automobile. She heard a loud noise and then the man ran to the passenger side of the car.

Verlin testified that, just as he lay down in his automobile, he heard a loud noise that sounded like a firecracker. He looked up and saw a woman in the front passenger seat of the Dodge opening the passenger door. The man he had seen earlier ran around the car to her door.

Beverly Culver, who had been asleep in the back seat of the Dodge with Katie's two older children, testified that she was awakened by a loud noise. She saw a man standing outside the car, next to David Hardin, who lay in the driver's seat with his head resting on the back of the seat, next to the door. The man hurried to the passenger side of the car.

8

Beverly, Verlin and Dessie all observed what happened next: As Katie Hardin tried to get out of the car, the man grabbed her and demanded that she go with him. She refused, and screamed for David, who lay fatally wounded in the driver's seat. The man shot Katie in the head. He then reached into the car and placed something into the waist-band of his pants. He ran to his truck and drove off, headed north.

Verlin called the police, who arrived at the rest area just before 5:30 a.m. Based on information obtained from the witnesses, a lookout was posted for a white male, proceeding north on Interstate 75, driving a dark-blue or black truck pulling an empty, yellow flat-bed trailer.

A truck fitting this description was spotted by police just south of Cordele and followed to a rest area in Dooly County. The truck parked in the exit lane of the rest area and the driver went to the restroom. Backup units arrived and the driver, [Appellant], was arrested after he returned to his truck. Officers smelled alcohol on [Appellant's] breath and he was initially taken to the Dooly County Sheriff's Office for an intoximeter test, which indicated that [Appellant's] blood alcohol level was .13 grams/percent. [Appellant] had what appeared to be blood on his left pants leg.

Officers recovered a .38 caliber revolver from under the driver's seat of [Appellant's] truck. The revolver had three live rounds and two spent cartridges in its chamber. A gun case and David Hardin's wallet lay on the passenger seat.

[Appellant] was returned to Cook County at approximately 7:30 a.m. Dessie Harris was at the courthouse, having just given a statement to investigators. As she stood outside smoking a cigarette, [Appellant] arrived in a police car. She immediately recognized him as the man who had shot David and Katie Hardin.

At approximately 2:30 p.m. of the same day, the body of William Gerald Hodges was found slumped over the wheel of his automobile in the parking lot of a truck stop in Valdosta. He had been

shot in the head and shoulder. The pathologist who conducted the autopsy testified that a time of death could not be established with any certainty. However, lividity patterns indicated that death had occurred some time prior to Hodges' arrival at the morgue at 3:10 p.m. A .38 caliber bullet was recovered from the interior of his automobile and another was recovered from inside his skull.

After [Appellant's] arrival in Cook County, his clothing was removed from him and the contents of his pockets were inventoried. In his shirt pockets were two . 38 caliber cartridges and an insurance card bearing the name William G. Hodges. In the pockets of his trousers were a gold Timex wristwatch and two gold rings, one having a red stone and the other a blue stone. The rings and the watch were identified by friends as having belonged to William Hodges. Serological examination of the reddish-brown substance on the leg of [Appellant's] trousers and on the blue-stone ring established that the substance was blood having characteristics consistent with the blood of William Hodges and inconsistent with the blood of 98.3 percent of the general population.

A fresh dent was discovered on the right rear corner of the roof of Hodges' automobile. The dent was horizontal, two or three inches long. Yellow paint was present in the grooves of the dent, and loose flakes of yellow paint surrounded the dent. The yellow paint was the same color as the trailer of [Appellant's] truck.

The .38 caliber revolver found in [Appellant's] truck was purchased by him at a Talledega, Alabama, pawn shop on May 9, 1980. Ballistics examination showed that the bullet removed from the skull of David Hardin, the bullet removed from the skull of Katie Hardin, the bullet removed from the skull of William Hodges and the bullet removed from the interior of Hodges' automobile had all been fired from the same gun: [Appellant's] .38 caliber revolver.

[Appellant] testified that he was returning from Florida on the 9th and 10th of July. He admitted that he stopped at the truck stop in Valdosta at approximately 10:00 p.m. on the 9th. He said he had two beers and three mixed drinks, and then went to sleep in his truck.

10

When he left a couple of hours later, he took with him a hitchhiker known to him only as "Jeff." He stopped briefly at the first rest area north of Valdosta on Interstate 75, near Hahira, to wash his hands, and subsequently let Jeff out at an exit near Adel. He then proceeded directly to the rest area in Dooly County where he was arrested. [Appellant] denied having stopped at the Lenox rest area. He admitted owning the .38 revolver found in his truck, but denied having shot anyone with it.

*Putman*, 308 S.E.2d at 147-48.

B.      Procedural Background

As previously mentioned, the state of Georgia prosecuted Appellant in two separate trials for the offenses described above.  In May 1981, Appellant was tried in Lowndes County and convicted of the murder of William Hodges.  The jury sentenced Appellant to life imprisonment.  The conviction and sentence were affirmed on direct appeal.  *See Putnam [sic] v. State*, 297 S.E.2d 286 (Ga. 1982). We are not aware of any collateral attacks by Appellant against the Lowndes County judgment.

In September 1982, Appellant was tried in Cook County and convicted of the murders of David Hardin and Katie Christine Back.  The jury sentenced Appellant to two death sentences, one for each murder.  The instant habeas petition challenges the Cook County convictions and sentences, which were affirmed on direct appeal.  *See Putman*, 308 S.E.2d at 145.

11

Appellant's first collateral attack on the Cook County judgment was a petition for writ of habeas corpus and a motion for stay of execution filed in state court. The state habeas court found that Appellant's petition lacked merit and denied Appellant's motion for a stay of execution. Appellant then filed a habeas petition and a motion for stay of execution in federal district court. The district court granted a stay of execution, but subsequently Appellant voluntarily dismissed the federal petition.

Shortly after the stay of execution, Appellant amended his state petition to assert a claim of ineffective assistance of trial counsel. Appellant also filed in state court alternative motions for a new trial and to set aside judgment in order to reopen the evidence in the state habeas corpus case. The state habeas court denied these motions. Appellant applied to the Supreme Court of Georgia for a certificate of probable cause. The court granted the application and remanded for an evidentiary hearing on the issue of trial counsel's alleged ineffectiveness.

On August 27, 1985, the state habeas court held an evidentiary hearing. In a written order dated April 4, 1989, the court set forth its findings of fact and conclusions of law, determining there was no merit to the ineffective assistance claim or any other issue raised by Appellant. On July 12, 1989, the Supreme Court of Georgia, with two justices dissenting, denied without opinion Appellant's

application for a certificate of probable cause.  The United States Supreme Court

denied certiorari.  *See Putman v. Zant*, 493 U.S. 1012, 110 S. Ct. 575 (1989).[4]

On April 23, 1997, Appellant filed the instant federal petition, seeking

habeas relief pursuant to 28 U.S.C. § 2254.  The district court denied the petition.

Appellant filed this appeal.

C.      Factual Background of Sentencing Phases and Legal Representations

Our narration of the facts relating to the sentencing phases, focusing on

Appellant's legal representations, is drawn from the record before the state habeas

court when it considered Appellant's habeas petition and his claims of ineffective

assistance.[5]   First, we summarize the legal experience of Appellant's two legal

---

[4] In June 1992, Appellant filed a second petition for writ of habeas corpus in state court.  The state habeas court dismissed most of Appellant's claims as being successive, but the court held a hearing on Appellant's six claims based on *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).  After the hearing, the state habeas court denied relief, finding one claim to be successive and the remaining five to lack merit.  The state's high court denied Appellant's application for a certificate of probable cause, and on April 20, 1995, rehearing was denied.  The United States Supreme Court denied certiorari on December 4, 1995, and denied rehearing on January 22, 1996.  *See Putman v. Thomas*, 516 U.S. 1012, 116 S. Ct. 570 (1995), *reh'g denied*, 516 U.S. 1099, 116 S. Ct. 829 (1996).  Since we have held Appellant's *Brady* claims lack merit and do not warrant a COA, *see supra* Part I & n.3, this second state habeas proceeding is not relevant to our discussion.

[5] In accordance with 28 U.S.C. § 2254(e)(1), we presume the factual findings of the state habeas court are correct, since Appellant has not presented clear and convincing evidence to the contrary.

teams. Second, we consider the evidence presented and arguments at the two sentencing phases, and we mention alleged potential witnesses who were not called to testify. Third, we explain differences in the jury instructions. Lastly, we examine the defense strategy of Appellant's Cook County team.

    1.    <u>Experience of Appellant's Attorneys</u>

        a.    <u>Lowndes County</u>

For the Lowndes County trial, Appellant's family privately obtained the services of attorney Elsie Griner, Sr. At the time of trial, Ms. Griner had over 60 years of trial experience and had tried countless criminal cases, including one death penalty case in which her client had received a life sentence. Ms. Griner served as lead counsel and was present at all hearings and at trial. The other defense counsel at the Lowndes County trial were Marcus Davis and Michael Bennett. Mr. Davis at the time of the trial had been an attorney for approximately five years. Mr. Bennett, who practiced in Lowndes County, had been an attorney for approximately four years and had never tried a death penalty case. In addition, Galen P. Alderman, a law student and the granddaughter of Ms. Griner, assisted Appellant's defense team.

        b.    <u>Cook County</u>

14

For the Cook County trial, Mr. Bennett was never a member of Appellant's defense team. Mr. Davis was initially on Appellant's Cook County team, but he withdrew early in the case and had little involvement. Ms. Griner again served as Appellant's lead counsel. In addition to Ms. Griner, Appellant was represented by Ms. Alderman and Daniel Studstill. Additionally, Ms. Griner's daughter (Elsie Griner, Jr.), was a lay investigator who assisted Appellant's Cook County team and conducted "[h]undreds of hours of investigation."

Ms. Alderman, a law student at the time of the Lowndes County trial, had since graduated and had been a member of the bar for just under a year at the time of the Cook County trial. Appellant's case was Ms. Alderman's first criminal trial as a lawyer.

Mr. Studstill was the Public Defender for the Alapaha Judicial Circuit, consisting of five counties. Mr. Studstill had practiced law since 1980. He had tried numerous criminal cases. Appellant's case was his first death penalty case as a defense attorney. Prior to being a lawyer, however, Mr. Studstill had worked for two years as an investigator in the district attorney's office and had been involved in the prosecution of four death penalty cases. On the eve of the Cook County trial, Mr. Studstill's father passed away. The state court refused to grant a

continuance. As a result, Mr. Studstill was absent for most of the guilt/innocence phase, but he was present for the sentencing phase.

    2.      Evidence Presented and Closing Arguments

    a.      Lowndes County

During the sentencing phase of the Lowndes County trial, Mr. Davis handled the examination of the witnesses. Nine witnesses were called to present evidence of mitigation. The witnesses were as follows: five relatives (wife, father, sister, sister-in-law, and step-sister's husband), a co-worker, Ms. Griner, a deputy from the prison where Appellant was detained, and Appellant himself.[6] Nearly all the witnesses testified Appellant would not pose a danger to others in prison and that keeping Appellant alive would be beneficial to society.

The relatives all gave the same general testimony. That is, Appellant was a man of good character and peaceful nature; he possessed a strong love for his family; and he was a good father, husband, and friend. The relatives recounted particular incidences when Appellant had been especially kind or helpful. On cross-examination, however, the relatives conceded they had not observed Appellant's character while he was traveling in his truck.

---

[6] The Lowndes County counsel did not call a mental health expert.

16

According to the co-worker, Appellant showed concern, took time to help, and was peaceful away from home. But on cross-examination, the co-worker conceded that he had not observed Appellant traveling in his truck, that he did not know Appellant took drugs to stay awake while traveling, and that he was unaware Appellant drank alcohol and occasionally mixed his anti-sleeping drugs with alcohol.

Ms. Griner testified Appellant was unusual compared to her other clients, who were often violent, and she was impressed by Appellant's non-violent manner, fairness, and concern for others. The prison deputy attested that Appellant had been a trouble-free prisoner, relating how Appellant advised visiting schoolchildren to stay out of prison.

In his own testimony, Appellant also informed the jury that he gave advice to visiting schoolchildren. In addition, Appellant communicated his family life, his employment history, his lack of any prior convictions, and a myriad of personal details. For instance, Appellant talked about his tending to a sick sibling; his love for his family; his religious courses in prison; and his belief in God.

Turning to the closing arguments, the prosecutor did not accuse Appellant of being friendless. Rather, the prosecutor explained the different theories of punishment: rehabilitation, deterrence, and retribution. The prosecutor contended

that Appellant was not worthy of rehabilitation, and that deterrence and retribution called for the death penalty.

Mr. Bennett conducted the closing argument on behalf of Appellant. He appealed to the jurors to consider the testimony of Appellant's relatives. In particular, he argued the crime for which Appellant was convicted was completely contrary to the reputation Appellant had established during the first 38 years of his life. Additionally, Mr. Bennett made a "lingering doubt" argument, raising the possibility that scientific evidence might someday establish Appellant to be innocent.

### b. Cook County

At the Cook County trial, four witnesses were called during the sentencing phase. Ms. Alderman examined three witnesses: Appellant's sister (who also testified in Lowndes County), Appellant's niece, and an agent from the Georgia Bureau of Investigation (GBI). Ms. Griner examined Appellant.

Although quantitatively less, the testimonies of the sister and niece were qualitatively similar to the testimonies given by the five relatives at the Lowndes County trial. As set forth in more detail in the margin, the sister and niece gave an impression of Appellant as a good family man and friend who was hard-working,

18

honest, loving, and non-violent.[7] Both the sister and niece stated it would be a loss

if Appellant were executed.

The GBI agent did not personally know Appellant. Rather, based on his file,

he narrated Appellant's employment history. This history showed that, for the

---

[7] Appellant's sister, who was older than Appellant, claimed to be a "second mother" to Appellant. She told the jury the following facts: (1) Appellant was close to all his brothers and sisters; (2) Appellant was a loving, considerate child who never caused any problems; (3) Appellant, as a young boy, worked odd jobs, such as delivering papers and groceries and mowing yards, using his income to support his family; (4) Appellant loved his children, wife, and family; (5) Appellant was non-violent, a "good person," a "fine man," and a "family man;" (6) While awaiting trial in prison, Appellant wrote many letters, inquiring about the family, especially Appellant's father; (7) during the week of July 4th prior to Appellant's arrest, Appellant hosted family members for a week-long gathering. Additionally, he had a barbecue for family, friends, and neighbors, and did most of the preparations himself; and (8) Appellant's death would be a loss, especially for his family.

Appellant's 19-year-old niece had lived periodically with Appellant since she was 8, and she considered Appellant's house to be her home. The niece told the jury the following facts: (1) She thought of Appellant as a "daddy" and "a very good friend" with a "great sense of humor;" (2) Appellant was "loving," "kind," and "honest;" (3) Appellant minded his own business, loved his family very much, and always worked very hard; (4) the niece had never heard Appellant tell a lie or seen him act violently; (5) Appellant had taught the niece a great many character traits, including honesty; (7) Appellant had successfully encouraged the niece to attend college; (8) Appellant treated the niece quite well, giving her money when needed; (9) since entering prison, Appellant had written the niece promising that he would help pay for her college education if possible; (10) Appellant called the niece from prison to inquire how she was doing in school; (11) Appellant never expressed concern for himself, only for others; and (12) it would be a loss if Appellant were to die.

most part, Appellant had been consistently employed. Additionally, the GBI agent was unable to find any derogatory information about Appellant's employment.

Appellant's testimony was similar to his testimony at the Lowndes County trial. During the guilt/innocence phase, Appellant informed the jury about his family, including his three children. At the sentencing phase, Appellant told the jury he had never been in trouble and had always been a hard worker. Additionally, Appellant maintained his innocence.

Turning to closing arguments, the Cook County prosecutor made an argument not made by the Lowndes County prosecutor. Specifically, he argued:

> More important than what you heard this afternoon is what you did not hear. You did not hear a preacher. You did not hear a gideon. You did not hear one single co-worker. You did not hear one single personal friend who knows him and knows what he's like. His wife knows him. His personal friends, if he has any, would know. But, you didn't have it and it wasn't there and it's not there. . . . [Appellant is] the kind of man who doesn't have a preacher to come and speak up for him; a personal friend; a close, close family member. So, I say to you that tells you more than anything else you've heard in three days about this man.

The foregoing argument to the jury did not go unrebutted. In her closing argument, Ms. Alderman explained that Appellant's friends lived far away, and Appellant could not afford to pay their travel expenses. She stressed that Appellant's family stood by him, and she pleaded for mercy. Additionally, she emphasized to the jury the seriousness of their deliberations—if they chose the

death penalty, Appellant would die by electrocution.  Finally, like Mr. Bennett in Lowndes County, Ms. Alderman made a "lingering doubt" argument, raising the possibility that one day Appellant's claim of innocence might be proven true.

c.    Witnesses Not Called at Cook County Trial

Not surprisingly, Appellant points to persons who were not called to testify at the Cook County trial.  Unlike in Lowndes County, neither a co-worker, a prison official, nor a lawyer testified for Appellant in Cook County.  In the state habeas proceeding, Appellant presented affidavits of numerous people who swore they would have testified in Cook County, if asked, and would have attested to Appellant's peaceful character.  Many also opined they did not believe Appellant was capable of committing murder.

The affiants were mostly family, friends, and co-workers.[8]  The affiants, however, did not include the co-worker and prison official who testified for Appellant in Lowndes County.  Some affiants were relatives who had testified at the Lowndes County trial, such as Appellant's ex-wife.  (Appellant divorced between the Lowndes County trial and the Cook County trial.)  Although

_____

[8] One affidavit was a one-and-half page opinion from a psychiatrist.  The psychiatrist asserts that Appellant should have received a psychiatric evaluation. The psychiatrist based his opinion on the other affidavits, a conversation with state habeas counsel, and the facts narrated in the Georgia Supreme Court's opinion on direct appeal.

21

Appellant's ex-wife was present at the Cook County trial, Appellant's lawyers decided not to call her for reasons discussed below. *See infra* Part II.C.4. Another affiant was a co-worker who attested that he was present at the Cook County trial, but was never asked to testify.

### 3. Jury Instructions

Although the evidence at the Lowndes County and Cook County sentencing phases was similar, the jury instructions had critical distinctions, as a result of different strategies pursued by the two prosecutors. The Lowndes County prosecutor presented only two aggravating circumstances to the jury: (1) Appellant committed murder in the course of another capital felony, to wit, the armed robbery of William Hodges, and (2) Appellant committed armed robbery for the purpose of receiving money or other things of monetary value, to wit, Hodges' two gold-colored rings and watch. Unless one of the these two aggravating circumstances was shown by proof beyond a reasonable doubt, the jury was instructed that it could not impose death under Georgia law. Of course, the jury ultimately did not impose death. Notably, the Lowndes County prosecutor did not argue—and the trial court did not instruct—that the jury should consider the murders of David Hardin and Katie Christine Back as aggravating circumstances.

In Cook County, the jury was also told that it could impose death if it found, beyond a reasonable doubt, the aggravating circumstance, to wit, murder during the commission of another capital felony. But the capital felonies alleged in Cook County were far more serious. The Cook County jury instructions pointed to three capital felonies for each murder count. For both the Hardin and Back murder counts, the murder of Hodges and the armed robbery of Hardin constituted two of the capital felonies. The third capital felony for the Back murder count was the Hardin murder, while the third capital felony for the Hardin murder count was the Back murder.[9] Simply stated, unlike their Lowndes County counterparts, the Cook County jurors were permitted to consider events in Cook County, including the egregious murders of Hardin and Back, when deciding whether to impose the death penalty.

---

[9] This reciprocal instruction was, in part, error under Georgia law. As the Georgia Supreme Court noted on direct appeal, the jury could have imposed the death penalty for *one* murder by using the second murder as an aggravating circumstance. *See Putman v. State*, 308 S.E.2d 145, 153 (Ga. 1983). But the jury could not impose *two* death penalties (i.e. one for each murder) where the only aggravating circumstance for each murder was the other murder. *See id.* (citing *Burden v. State*, 297 S.E.2d 242, 315-16 (Ga. 1982)). Nonetheless, this error was harmless under Georgia law because, for both the Hardin and Back murders, the jury had relied on an independent aggravating circumstance (the Hardin armed robbery). Most importantly, for purposes of our discussion here, this error is irrelevant because, unlike the Lowndes County jury, the Cook County jury was permitted to consider at least one of the Cook County murders as an aggravating circumstance for one of the two death penalties it imposed.

23

In his closing argument, the Cook County prosecutor took advantage of this more favorable jury instruction by emphasizing that Appellant had committed three murders. The Cook County prosecutor highlighted the particular, and more egregious, facts of the Hardin and Back murders—facts which the Lowndes County prosecutor did not, and could not, mention in his closing argument. For instance, the Cook County prosecutor stated:

> I want to point out that . . . [Appellant] executed the mother of three children in part of their presence. I want to point out to you ladies and gentlemen of the jury, that Katie Christine Back's death could have been worse. I ask you to recall the circumstances in which he attempted to force her from the automobile, force her to leave with him, tried to drag her out of the vehicle, she refused, she fought, she screamed, she was shot and killed.

In imposing two death penalties, the Cook County jury relied on three aggravating circumstances: the Hardin murder, the Back murder, and the Hardin armed robbery.[10] Interestingly, the Cook County jury did not find the Hodges murder in Lowndes County to be an aggravating circumstance.

4.     Cook County Defense Strategy

Initially, the division of labor amongst Appellant's Cook County attorneys was to be as follows: Ms. Griner and Ms. Alderman would handle the investigative

---

[10] For one of the two death penalties, the Georgia Supreme Court found it to be error (albeit harmless) under Georgia law for the jury to rely on the reciprocal murder charge as an aggravating circumstance. *See supra* note 9.

work and the guilt/innocence phase; Mr. Studstill would handle motions and voire dire; and all three attorneys would handle the sentencing phase. When Mr. Studstill was unable to attend the beginning of the trial due to his father's death, Ms. Griner conducted voire dire.

All three Cook County attorneys were fully aware of the defense presented at the Lowndes County trial. The Cook County court held a pre-trial hearing in Lowndes County for the sole purpose of giving Appellant's attorneys the opportunity to review the Lowndes County record. Furthermore, Ms. Griner, as lead counsel, had been present for the entire Lowndes County trial, and along with her investigator, examined the Lowndes County record. Ms. Alderman, who assisted at the Lowndes County trial, had access to the Lowndes County transcript. Mr. Studstill, although not involved with the Lowndes County trial, personally reviewed the entire Lowndes County transcript.

Although all three attorneys were to share responsibility for the sentencing phase, it became evident at the 1985 habeas hearing that Ms. Griner did the majority of the preparation.[11] Ms. Griner's primary strategy was to prove

---

[11] Interestingly, Appellant's state habeas counsel called Mr. Davis, Mr. Studstill, and Ms. Alderman to testify at the 1985 hearing, but did not call Ms. Griner as a witness. Rather, Appellee called Ms. Griner in order to give the state habeas court a full view of Appellant's Cook County legal representation.

25

Appellant's innocence (and thus avoid sentencing). She pursued this strategy by lodging objections throughout the trial and by placing Appellant on the stand to explain his version of events.

Nonetheless, Ms. Griner did spend time preparing for the sentencing phase in the event Appellant was found guilty. She interviewed Appellant "hundreds of times and talked to Appellant's family members." In particular, Ms. Griner considered calling as witnesses Appellant's daughter, ex-wife, sister, and niece, as well as the GBI agent. Ms. Griner decided against calling the daughter because "she was too angry." Likewise, Ms. Griner decided not to call Appellant's ex-wife because she was "too upset" to testify.

Additionally, Ms. Griner spoke with Appellant "a lot" and "specifically" about which persons would be called as witnesses for the sentencing phase, and Appellant suggested a number of persons to call as witnesses, including some co-workers from Alabama. Ms. Griner was unable to locate one co-worker, who had driven with Appellant, because he had left town. Ms. Griner also contacted one of Appellant's neighbors, who attended the Lowndes County trial. Ms. Griner planned to call the neighbor as a character witness, but at trial, she learned the neighbor would not be able to miss work to attend the Cook County proceeding. Lastly, Ms. Griner talked to other potential witnesses at the trial (though she could

not remember precisely who), but because they got upset about the guilty verdict, they could not testify.

By contrast, Mr. Studstill did not prepare any witnesses for the sentencing phase. Mr. Studstill neither subpoenaed any witnesses (other than those already subpoenaed by the prosecution) nor interviewed any witnesses. This is not surprising. Of Appellant's three attorneys, Mr. Studstill was the least familiar with the facts of the case, since he had not been involved with the Lowndes County trial. As such, Mr. Studstill's contributions primarily involved legal, rather than factual, matters.

Based on his experience in Cook County and the evidence against Appellant, Mr. Studstill believed Appellant was likely to be convicted and to receive the death penalty.[12] As he testified at the 1985 evidentiary hearing, "[I]n Cook County, I think they're real pro death penalty[,] and I don't believe . . . that we could have put up anybody at the mitigation sentencing phase that would have changed the jury's mind." Rather than focusing on sentencing, Mr. Studstill concentrated his efforts on creating legal error in the trial. The following exchange between Appellant's state habeas counsel and Mr. Studstill at the 1985 hearing accurately

---

[12] In contrast to Mr. Studstill's experience in Cook County, Mr. Davis—Appellant's Lowndes County counsel, who did not think the death penalty was inevitable—had tried one case in Cook County.

summarizes Mr. Studstill's strategic thinking at the time of trial (in contrast to habeas counsel's strategic thinking after trial):

> [Habeas Counsel]: Nobody was called other than the two witnesses who happened to be in the courtroom that day.
>
> [Mr. Studstill]: Yes.
>
> [Habeas Counsel]: Is that fact—correct?  Does that about sum up how the decisions were made?
>
> [Mr. Studstill]: Well, no, you've implied that we were flying by the seat of our pants.  And that's not exactly the way things were happening.
>
> . . . .
>
> If we could back up a little bit, I felt like [the death penalty] was inevitable.  So I thought my major role was to lay . . . the judge traps and to perfect the record on appeal.  And that was basically what I was going to do with voire dire.  That was what I was going to try to do during my portion of the guilt/innocence whether it be through cross examination or whether it be through the raising of evidentiary motions or whatever.  Okay?
>
> Not being really familiar in detail with every fact of the case, some of these people [mentioned as possible mitigation witnesses] . . . mean nothing to me.  Because, as I said, I prepared mostly for the legal issues of the judge traps and trying to get it turned on appeal and then having the State accept life sentence if we got it reversed on appeal.

Prior to trial, one "judge trap" Mr. Studstill tried to set was a motion for sequestration of jurors during voir dire.  Mr. Studstill hoped to show that the trial

28

judge, in violation of Appellant's due process right, always denied requests to sequester jurors during voire dire. Mr. Studstill filed many other pre-trial motions, including a motion to suppress, a motion for additional peremptory challenges, and a motion to exclude all references to the Hodges murder.

During the sentencing phase, Mr. Studstill made several additional legal objections. For instance, with respect to the jury instructions, Mr. Studstill cited Georgia case law for the proposition that the Hodges murder was completed prior to the Hardin and Back murders, and therefore the jury could not consider the Hodges murder as an aggravating circumstance. Again citing Georgia case law, he further argued that, since Appellant had not been charged with the armed robbery of Hardin, the jury could not consider armed robbery as an aggravating circumstance. Mr. Studstill also contended that the jury should not be permitted during their deliberations to view certain photographs which, in his view, would inflame the jury's passion.

Finally, Mr. Studstill did not ignore the sentencing aspect of the case. He was present, along with Ms. Griner, for meetings with family members, friends, and acquaintances from his employment. Mr. Studstill testified that the defense team considered calling a number of witnesses based on their relation to Appellant. In particular, Mr. Studstill discussed with Ms. Griner and Ms. Alderman whether

29

Appellant's ex-wife should testify, and he agreed that, due to the recent divorce, she would not be a favorable witness.  Additionally, Mr. Studstill, along with other members of the defense team, became familiar with Appellant's employment history.

Turning to Ms. Alderman, her testimony at the 1985 habeas hearing, if believed, is quite favorable to Appellant's claim of ineffective assistance of counsel.  For instance, she attested she was not prepared to proceed with the sentencing phase of the trial. Ms. Alderman also asserted that, other than the decision not to call Appellant's ex-wife, no strategic decisions were made with respect to the sentencing phase.  In addition, Ms. Alderman asserted that she conducted the entire Cook County trial herself —assertion clearly at odds with the trial record.[13]   In sum, according to Ms. Alderman, it was just luck that some witnesses were available for the sentencing phase, and Appellant's Cook County legal team had done nothing prior to the conclusion of the guilt/innocence phase to prepare for the sentencing phase.

---

[13]  Ms. Alderman's assertion contradicted, at least, the following undisputed facts:  Ms. Griner was present and sitting next to Ms. Alderman for the entire trial; Ms. Griner conducted voire dire; Ms. Griner made numerous evidentiary objections during the trial; Ms. Griner examined Appellant; Ms. Griner made the closing argument for the guilt/innocence phase; and Mr. Studstill made a lengthy legal argument about the sentencing instructions.

The state habeas court, however, rejected Ms. Alderman's version of events. Expressly relying on Mr. Studstill and Ms. Griner's testimony, it found that "[p]reparation for the sentencing phase of the trial took place before trial, during trial, and during the recess between the guilt/innocence and sentencing phases of trial." The court's rejection of Ms. Alderman's characterizations is supported by Ms. Alderman's implicit admission that she was partial to Appellant's cause.

Finally, Mr. Davis, one of Appellant's Lowndes County attorneys, testified at the 1985 habeas hearing. He explained that he withdrew as Appellant's counsel for the Cook County trial in large part because of an "irreconcilable difference of opinion" with Ms. Griner and Ms. Alderman. This difference of opinion centered on where to concentrate their efforts. According to Mr. Davis, Ms. Griner had a "very deep seeded belief that [Appellant] was innocent." This belief interfered with Mr. Davis's preferred legal strategy, which was to focus on the sentencing phase. As Mr. Davis explained at the 1985 hearing, "[I]f I had been in the [Cook County] case, my energies would have directed probably 80 percent to the sentencing phase." In sum, Mr. Davis wanted the Cook County team to strictly follow the strategy of the Lowndes County team.

## III. STANDARD OF REVIEW

31

The district court neither held an evidentiary hearing nor made any independent findings of fact. Therefore, its holding was one of law and is reviewed de novo. *See Hill v. Moore*, 175 F.3d 915, 921 (11th Cir. 1999), *cert. denied* 528 U.S. 1087, 120 S. Ct. 815 (2000). Sitting as a federal habeas court, however, we (like the district court) are reviewing, in essence, a decision of the courts of Georgia. Since Appellant's petition was filed after April 24, 1996, our review of state court decisions is governed by AEDPA. *See Penry v. Johnson*, ___ U.S. ___, 121 S. Ct. 1910, 1918 (2001). In particular, 28 U.S.C. § 2254(d), as amended by AEDPA, provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Furthermore, a state court's factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Appellant does not dispute the factual findings of the Georgia courts. Therefore, neither § 2254(d)(2) nor § 2254(e)(1) is relevant to our inquiry. Rather,

32

pursuant to § 2254(d)(1), Appellant challenges the legal rulings of the Georgia courts.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions. *See Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 1519 (2000). A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. *See Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000).

A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. *See id.* An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. *See id.* Notably, an "unreasonable application" is an "objectively unreasonable" application.[14] *See Williams*, 526 U.S. at 412, 120 S. Ct. at 1523.

_____

[14] By interpreting "unreasonable application" as "objective unreasonableness," the Supreme Court in *Williams* rejected the "reasonable jurist" standard announced by this Court in *Neelley v. Nagle*, 138 F.3d 917, 924-25 (11th

33

Lastly, § 2254(d)(1) provides a measuring stick for federal habeas courts reviewing state court decisions. That measuring stick is "clearly established Federal law." 28 U.S.C. § 2254(d). Clearly established federal law is *not* the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision."[15] *Williams*, 526 U.S. at 412, 120 S. Ct. at 1523.

## IV. DISCUSSION

As previously discussed, the only claim for which Appellant has been granted a COA is ineffective assistance of counsel at the sentencing phase. *See supra* Part I. This claim was rejected by the state habeas court in its order of April 4, 1989, which was affirmed by the Supreme Court of Georgia on July 12,

---

Cir. 1998). *See Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001) (citing *Williams*, 526 U.S. at 409-10, 120 S. Ct. at 1521-22). Here, the district court rendered its decision prior to *Williams* and thus applied the *Neelley* "reasonable jurist" standard. *See Putman*, 53 F.Supp.2d at 1297. Appellant argues this error requires a remand. We disagree. Our plenary power of de novo review enables us to correct legal errors where further factfinding is unnecessary. *See Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1266 n.13 (11th Cir.), *reh'g denied*, 206 F.3d 1397 (11th Cir. 2000). In this case, the district court made no independent findings of fact, so its decision was one of pure law.

[15] When we mention "clearly established federal law" in this opinion, we are referring to the definition set forth in the text.

1989.  In accordance with § 2254(d)(1)'s standard of review, we first set forth the pertinent landscape of clearly established federal law as of July 12, 1989.  Then, considering the legal conclusions of the state habeas court (affirmed by the Supreme Court of Georgia), we analyze whether those conclusions were contrary to, or an unreasonable application of, clearly established federal law.

A.    Legal Landscape

Appellant has not cited, and we have not found, any Supreme Court case, as of July 12, 1989, that is materially indistinguishable from the facts of the case *sub judice*.  By that same date, however, it cannot be disputed that the benchmark for ineffective assistance of counsel claims was *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).  To the present day, *Strickland* has not been materially modified and continues to serve as the benchmark.  *See Williams*, 526 U.S. at 391, 120 S. Ct. at 1512 (stating "the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims").

In *Strickland*, the Court established a two-prong standard for adjudicating ineffective assistance of counsel claims:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the counsel "guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This

35

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  To gain relief, a petitioner must prevail on both prongs.  *See id.*

B.    "Contrary to" and "Unreasonable Application" Analyses

Having defined the boundaries of clearly established federal law for ineffective assistance of counsel, we quickly analyze, and reject, the notion that the state habeas court's decision was "contrary to" clearly established federal law. Then, we look at the more debatable question:  whether the state habeas court made an "unreasonably application" of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

1.   "Contrary To"

To reiterate, a state court's decision is "contrary to" clearly established federal law either if it applies a rule contradictory to the governing law set forth by Supreme Court or if it arrives at a different result from a Supreme Court case when faced with a case containing materially indistinguishable facts.  *See supra* Part III. In this case, the state habeas court correctly cited *Strickland* as the appropriate legal standard.  Furthermore, the court correctly explained that Appellant could prevail under *Strickland* only if he could show both deficient performance and prejudice.  As such, the state habeas court's decision did not contradict governing

36

law.  Additionally, as already noted, there is no Supreme Court case that is materially indistinguishable from the facts of this case.  *See supra* Part IV.A.  Hence, the state habeas court's decision was not contrary to clearly established federal law.

2.  "Unreasonable Application"

Again, an "unreasonable application" is an "objectively unreasonable" application of federal law.  *See supra* Part III.  The state habeas court concluded that Appellant's ineffective assistance claim failed on both the performance and prejudice prongs of *Strickland*.  We first explain general principles of law related to the performance prong and then apply those principles to this case.  We then set forth general principles related to the prejudice prong and apply those principles accordingly.

a. <u>Deficient Performance</u>

i. <u>Principles of Deficient Performance</u>[16]

For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066. In other words, when reviewing counsel's decisions, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, ___ , 107 S. Ct. 3114, 3126 (1987)), *cert. denied* __ U.S. __, 121 S. Ct. 1217 (2001). Furthermore, "[t]he burden of persuasion is on a petitioner to prove, by a preponderance of competence evidence, that counsel's performance was unreasonable." *Id.* (citing *Strickland*, 466 U.S. at ___, 104 S. Ct. at 2064). This burden of persuasion, though not insurmountable, is

---

[16] Recently, in *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc), we fully explained the principles underlying deficient performance in the context of the sentencing phase. These principles flow from three Supreme Court cases decided before July 12, 1989— the date on which the Supreme Court of Georgia affirmed the decision of the state habeas court. *See id.* at 1313 n.10 (citing *Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114 (1987); *Darden v. Wainright*, 477 U.S. 168, 106 S. Ct. 2464 (1986); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)). Here, we summarize the most pertinent principles from *Chandler*.

a heavy one.  *See id.* at 1314 (citing *Kimmelman v. Morrison*, 477 U.S. 365, ___, 106 S. Ct. 2574, 2586 (1986)).

"'Judicial scrutiny of counsel's performance must be highly deferential,'" and courts "must avoid second-guessing counsel's performance." *Id.* at 1314 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).  "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 689-90, 104 S. Ct. at 2065-66).  Therefore, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id.* (quoting *Darden v. Wainright*, 477 U.S. 168, 106 S. Ct. 2464 (1986)).

If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel exercised reasonable professional judgment.  *See id.* at 1314-15 n.15.  Thus, the presumption afforded counsel's performance "is not . . . that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act." *Id.*  Rather, the presumption is "that what the particular defense lawyer did at trial—for example, what witnesses he

presented or did not present—were acts that some reasonable lawyer *might* do." *Id.* (emphasis added).

Moreover, "[t]he reasonableness of a counsel's performance is an objective inquiry." *Id.* at 1315. For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take." *Id.* To uphold a lawyer's strategy, a court "need not attempt to divine the lawyer's mental processes underlying the strategy." *Id.* at 1315 n.16.

Finally, "[n]o absolute rules dictate what is reasonable performance for lawyers." *Id.* at 1317. Absolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions. *See id.* As such, at a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy. *See id.* at 1319 (citing *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc)). Counsel's complete failure to present mitigation evidence does not necessarily constitute deficient performance, even if mitigation evidence is available. *See Waters*, 46 F.3d at 1511 (citing cases) (cited in *Chandler*, 218 F.3d at 1319).

## ii. Application of Principles

Appellant's argues that his Cook County lawyers were deficient in not replicating the strategy of the Lowndes County lawyers. The argument is flawed, as we stated in *Chandler*:

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. . . . [O]ur inquiry is limited to whether this strategy, that is, course A, *might* have been a reasonable one.

*Chandler*, 218 F.3d at 1315 n.16 (emphasis added). Moreover, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037 (2000) (quoted in *Chandler*, 218 F.3d at 1315 n.16).

In this case, the proper inquiry for the state habeas court was *not* whether Appellant's Cook County lawyers acted reasonably in choosing their strategy over the Lowndes County strategy. Rather, the proper inquiry was "the reasonableness of [Cook County] counsel's challenged conduct [based] on the facts of [this] particular case, viewed as of the time of [Cook County] counsel's conduct."[17]

---

[17] Of course, our task is not to repeat this inquiry. Instead, our duty is to determine whether the state habeas court was objectively reasonable in its *Strickland* inquiry. *See supra* Part III.

*Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066. The burden was on Appellant to identify the acts and omissions of Cook County counsel that, in his view, were not the result of reasonable professional judgment. *See id.* After Appellant identified such acts and omissions, the state habeas court was then required to "determine whether, *in light of all the circumstances*, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* (emphasis added). Of course, one circumstance was the fact that Cook County counsel was cognizant of the Lowndes County sentencing strategy and its result.

Looking first at counsel's acts,[18] Appellant fails to identify any act of Cook County counsel that falls outside the wide range of professional competence. Granted, the Cook County strategy perhaps could have been better. For instance, Mr. Davis, a Lowndes County attorney, faulted Ms. Griner for not putting more resources and more emphasis into the Cook County sentencing stage. However, "[t]est for ineffectiveness is not whether counsel could have done more; perfection is not required." *Waters*, 46 F.3d at 1518. "Nor is the test whether the best

---

[18] As is evident from our discussion above, *see supra* Part II.C.4, Cook County counsel pursued a two-prong strategy. Ms. Griner attempted to prove Appellant's innocence (and avoid sentencing), but she also spent time preparing for Appellant's sentencing. On the other hand, Mr. Studstill, relying on his experience, was convinced that a Cook County jury would convict and impose death; Mr. Studstill thus chose to inject error into the trial so the conviction or sentence could be reversed on appeal.

criminal defense attorneys might have done more." *Id.* Counsel almost always can

do more, but the Constitution requires only that counsel act reasonably. Here, the

state habeas court was objectively reasonable in concluding that the acts of Cook

County counsel with regard to sentencing—though less than suggested by Mr.

Davis—were nonetheless reasonable.

Turning to the omissions identified by Appellant, the first alleged

unreasonable omission is a failure to investigate. In support of this contention,

Appellant submitted affidavits by potential mitigation witnesses, many of whom

did not testify at either trial.[19] *See supra* Part II.C.2.c. This contention lacks merit.

The Cook County lawyers, either by personal experience, a review of the

transcript, or both, were fully aware of the mitigation evidence presented at the

Lowndes County trial—where Appellant concedes counsel performed reasonably.

Since the Lowndes County lawyers unearthed sufficient mitigation evidence to

render competent assistance, the Sixth Amendment did not mandate further

---

[19] We previously have spoken unfavorably of such affidavits:
It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. . . . But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.
*Waters*, 46 F.3d at 1513-14.

investigation by the Cook County lawyers[20]—who, according to Appellant, could have freely borrowed from the investigative work of the Lowndes County lawyers. This is especially true considering that Ms. Griner was the lead counsel for both trials.

The second, and primary, omission identified by Appellant is a failure to present readily available mitigation evidence. As noted in Part II, Lowndes County counsel called nine witnesses, whereas Cook County counsel called only four witnesses. Appellant argues that Cook County counsel was constitutionally compelled to call most or all of the witnesses from the Lowndes County sentencing. On this subject, the state habeas court concluded:

> A review of the trial transcripts from the Cook County trial and the preceding Lowndes County trial indicate that the distinction between the testimony heard at the corresponding sentencing phases was the number of witnesses testifying, while the substance of their testimony was very similar. Counsel at the Cook County trial made a strategic decision in regard to what mitigating evidence to present. In examining the substance of the testimony, this Court finds that trial

---

[20] Besides there being no constitutional requirement for the Cook County lawyers to procure additional character witnesses, Appellant has not shown that the Cook County lawyers acted incompetently in failing to present expert psychiatric testimony. No such testimony was presented in Lowndes County, where Appellant concedes his counsel was competent. Furthermore, the lone affidavit from a psychiatrist in the state habeas record is purely conclusory and of little, if any, evidentiary value. *Cf. Waters*, 46 F.3d at 1514 (rejecting conclusory affidavit presented by psychologist).

44

counsel's actions were reasonable in light of the circumstances at the Cook county trial.

To determine whether this legal conclusion was objectively reasonable, we examine each of the witnesses who testified in Lowndes County but not in Cook County.

First, Appellant's former wife divorced him shortly before the Cook County proceedings. Ms. Griner testified that Appellant's ex-wife was too upset to testify. All three Cook County attorneys agreed that, due to the recent divorce, calling Appellant's ex-wife would be imprudent. Even Ms. Alderman, who was markedly biased in favor of Appellant at the 1985 habeas hearing, conceded a strategic decision was made not to call Appellant's ex-wife.

Second, besides Appellant's ex-wife, three of the four other relatives who testified in Lowndes County did not testify in Cook County. Only two relatives testified at the Cook County trial—Appellant's sister (who also testified in Lowndes County) and Appellant's niece (who did not testify in Lowndes County). As the state habeas court indicated, however, the testimony of the five Lowndes County relatives was substantially the same as the testimony of the two Cook County relatives. Calling the three additional relatives to the stand would have been cumulative. More of the same is not necessarily better. *See Chandler*, 218 F.3d at 1319.

45

Third, Ms. Griner's testimony in Lowndes County was not substantially different from the testimony of Appellant's sister and niece. More importantly, however, rules of professional conduct generally disapprove of lawyers testifying at proceedings in which they are also advocates. *See, e.g.,* Model Rules of Prof'l Conduct R. 3.7(a) (2001) (stating that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ."); Model Code of Prof'l Responsibility EC 5-9 (1969) (stating, "[a]n advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility," and "[t]he roles of an advocate and a witness are inconsistent"). Although an attorney has an "ethical duty to advance the interest of [her] client," that duty "is limited by an equally solemn duty to comply with the law and standards of professional conduct." *Card v. Dugger*, 911 F.2d 1494, 1503 (11th Cir. 1990) (internal quotations omitted). Ms. Griner's decision to testify on behalf of her client in Lowndes County was arguably unethical. But one cannot plausibly argue that she acted unprofessionally when, in accordance with ethical norms, she did not testify in Cook County.

Fourth, one of Appellant's co-workers testified at Lowndes County, but he did not testify at the Cook County trial. Presumably, a co-worker would shed light on Appellant's character away from home and on the road. Nevertheless, the co-

worker's testimony was not significantly different, in substance, from that of

Appellant's sister and niece. On cross-examination at the Lowndes County trial,

the co-worker conceded he had not driven on the road with Appellant and was

unaware of Appellant's drug and alcohol habits while on the road. Based on this

cross-examination, reasonable counsel could have decided against calling the co-

worker in Cook County. *Cf. Chandler*, 218 F.3d at 1322 (noting that trial counsel

acts reasonably by not calling a character witness for fear of damaging cross-

examination). Furthermore, the state habeas record lacks any evidence that the co-

worker was willing and able to testify in Cook County. Where the record is

incomplete or unclear, a court must presume that counsel acted reasonably. *See*

*Williams v. Head*, 185 F.3d 1223, 1227-28 (11th Cir. 1999), *cert. denied*, 530 U.S.

1246, 120 S. Ct. 2696 (2000).

Nonetheless, Appellant did present to the state court a number of affidavits

from co-workers and friends who swore they would have testified for Appellant, if

asked. No doubt, personal testimony from a non-family member probably would

have been helpful to Appellant. This appears to be true (albeit in hindsight) in

light of the Cook County prosecutor's argument in closing about Appellant's lack

of friends. Ms. Griner attempted to procure testimony from Appellant's co-

workers and friends. In fact, Ms. Griner thought a neighbor would appear, but at

47

the last minute, she learned otherwise. Moreover, Ms. Griner tried to locate a co-worker (suggested by Appellant) who had been on the road with Appellant, but the co-worker could not be found. In any event, rather than rely on a co-worker, Ms. Alderman informed the jury about Appellant's trouble-free employment history through the testimony of a law enforcement officer (the GBI agent).[21] Finally, Ms. Alderman rebutted the prosecutor's contention that Appellant lacked friends, by explaining in closing argument that Appellant's friends lived a great distance away.

Cook County counsel perhaps could have done more to procure the testimony of co-workers and friends. For instance, counsel possibly could have subpoenaed a co-worker (even though the witness suggested by Appellant could not be located and thus could not have been served). But just because counsel might have done more does not mean counsel was incompetent. *See Chandler*, 218 F.3d at 1313.

Fifth, a deputy from the prison where Appellant was incarcerated testified at the Lowndes County trial, but not at the Cook County trial. Every reasonable counsel, Appellant argues, would have called the prison deputy to testify, because such a witness would have shown Appellant to be a model prisoner whose death

---

[21]Appellant's present habeas counsel criticizes this decision since the GBI agent did not personally know Appellant, but in the same brief, counsel argues that having testimony from law enforcement officials is a sound strategy.

would be a loss to society. Like the co-worker witness, however, Appellant has not shown the prison deputy was willing or available to testify at the Cook County trial. No evidence was presented to the state habeas court that the prison deputy, or any other prison official, was available or willing to give favorable testimony. Again, where the record is unclear, we must presume counsel acted reasonably.[22] *See Chandler*, 218 F.3d at 1314-15 n .15.

In sum, Appellant's primary contention is that Cook County counsel provided ineffective assistance by failing to present a replica of the Lowndes County mitigation case. In accordance with our discussion above, however, the state habeas court's conclusion that Cook County counsel performed competently pursuant to *Strickland* is objectively reasonable, even in light of the fact that Cook County counsel was aware of the Lowndes County strategy and its success in avoiding the death penalty for a different murder with different aggravating circumstances. [23]

---

[22] More than a year elapsed between the Lowndes County and Cook County trials. It is entirely possible that the prison deputy's opinion of Appellant changed in that time, or that for some other reason, the prison deputy was no longer willing or able to present the same testimony.

[23] Appellant relies heavily on our decision in *Collier v. Turpin*, 177 F.3d 1184, 1198-1204 (11th Cir. 1999). *Collier* is distinguishable in at least two ways. First, in *Collier*, we addressed a pre-AEDPA claim; as such, we were not required to accord the same level of deference to state court decisions, as we are now

b. <u>Prejudice</u>

i. <u>Principles of Prejudice</u>

To show prejudice, it must be established that, but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . . ," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693, 104 S. Ct. at 2067. Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S. Ct. at 2068. Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the

---

required to do post-AEDPA. *See Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1518.

Second, in *Collier*, trial counsel's examination gave the jury "the impression that the witnesses knew little or nothing about [the petitioner.]" 177 F.3d at 1202. Counsel failed to "develop[] an image of [the petitioner] as a human being who was generally a good family man and a good public citizen, who had a background of poverty but who had worked hard as a child and as an adult to support his family and close relatives." *Id.* By contrast, in this case, Ms. Alderman, through her direct examination of Appellant's sister and niece, presented Appellant as a good family man who had worked hard as a child and as an adult to support his family and relatives. *See supra* note 7.

sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S. Ct. at 2069.

One *Strickland* principle is particularly pertinent to the case *sub judice*:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

*Id.* at 694-95, 104 S. Ct. at 2068.

### ii.   Application of Principles

We already have held that the state habeas court was not objectively unreasonable in concluding that counsel rendered competent assistance. The state court held, as an additional basis for denying relief, that Appellant failed to satisfy the prejudice prong of the ineffective assistance standard: our inquiry as to that holding is whether the state habeas court was objectively reasonable in concluding that Appellant was not prejudiced by the failure of Cook County counsel to present the Lowndes County mitigation case.

Regarding prejudice, the state habeas court concluded:

51

The murders in Cook County were committed in a more egregious manner than the murder in Lowndes County. There were two victims instead of one, and the murders took place in the presence of the victims' children.

The murders in Cook County were observed by three eyewitnesses, and were committed without any provocation on the part of the victims. . . . The evidence in the Lowndes County case, while certainly sufficient to authorize conviction, was more circumstantial in nature. [Appellant] has not shown this Court that he was prejudiced by the strategic choices made by trial counsel . . . .

A core premise underpinning Appellant's argument is that the Cook County and Lowndes County trials concerned essentially the same crime. As the state habeas court recognized, however, the juries in Cook County and Lowndes County did not sentence Appellant for the same crime.

The foregoing is demonstrated by the fact that the two juries received quite distinct instructions. *See supra* Part III.C.3. Appellant's argument depends on the assumption that the Lowndes County jury must have considered the Cook County murders, because evidence about the Cook County murders was admitted. We cannot accept this assumption because it is contrary to *Strickland*. *Strickland* teaches that courts must assume "the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." 466 U.S. at 695, 104 S. Ct. at 2068. In the Lowndes County case, the "standard" for the jury to consider encompassed two aggravating circumstances (the armed robbery of

52

Hodges and the commission of an armed robbery for the purpose of receiving things of monetary value). Neither of these circumstances concerned events in Cook County. The Lowndes County jury did not find Appellant guilty of either aggravating circumstance; without such a finding, the Lowndes County jury could not impose death. Simply put, the jury instructions forbade the Lowndes County jury from considering the events in Cook County during the penalty phase, and pursuant to *Strickland*, we assume the Lowndes County jurors followed their instructions.

In contrast, the Cook County jurors were permitted, in accordance with their instructions, to consider both the Cook County murders and the Lowndes County murder as aggravating circumstances, as well as the armed robbery in Cook County. Interestingly, the Cook County jury did not rely on the Lowndes County murder as an aggravating circumstance. Instead, the Cook County jury, in imposing death, relied solely on events in Cook County as aggravating circumstances. By comparison, the Lowndes County jury did not rely on any events in Cook County.

As the state habeas court noted, the Cook County murders were supported by very strong evidence, and the murders were particularly egregious—two parents killed in front of their small children. As indicated by our discussion regarding the

performance prong, the evidence presented at the two sentencing phases differed only in volume, not in substance. Additional mitigation evidence of Appellant's good character probably would not have overcome the strong aggravating circumstances supporting death. Therefore, the state habeas court was objectively reasonable in concluding that, even if the Cook County jury had heard the Lowndes County mitigation case, there was not a reasonable probability Appellant would have received a life sentence.

## III. CONCLUSION

Appellant has failed to show that the courts of Georgia made a decision that was contrary to, or an unreasonable application of, clearly established federal law. Therefore, the district court correctly denied Appellant's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

AFFIRMED.

WILSON, Circuit Judge, dissenting:

I respectfully dissent from the court's opinion in this case, because I believe that the representation Appellant received at the penalty phase of his case fell short of constitutionally acceptable standards. The record indicates that Appellant's attorneys did very little to ensure that their client would submit a credible mitigation case at the sentencing phase. Absent this deficient performance, it is

54

likely that Appellant would have received a life sentence rather than the death penalty.

Deficient Performance

The majority correctly points out that when evaluating claims of deficient performance, we must look at the strategic course that the Appellant's lawyers elected to take, and determine if those actions were reasonable . *See Chandler*, 218 F.3d at 1315 n.16. It is irrelevant whether the decision to select the strategy they pursued was wise *vis a vis* some other, alternative strategy that was not selected (or not even considered); the relevant question is whether the strategy that was actually chosen, and the efforts to implement that strategy, might have been reasonable. *See id.*

What strategy did Appellant's counsel pursue at the sentencing phase of this case? To the extent that they settled on any clear strategy for the penalty phase, counsel appear to have decided to focus on presenting testimony reflecting Appellant's generally positive character and reputation prior to the crime. Alderman's examination of Appellant's niece and sister at the sentencing phase, as well as the questions directed to G.B.I. agent Grissom, reflected this general aim. Appellant's Lowndes County attorneys employed this same strategy, and Appellant's Cook County counsel were aware of the success of that strategy in that

trial. Given the facts of the instant case, it was an eminently reasonable decision for Cook County counsel to elect to use the same general strategy in Appellant's second trial.

However, simply settling on a potentially reasonable strategy does not discharge an attorney's constitutional responsibilities to her client. The attorney's conduct in pursuing that strategy at trial must still conform to *Strickland's* reasonableness standard, *i.e.* the actions (or omissions) of counsel must still fall within the wide range of professional competence. *See Chandler*, 218 F.3d at 1313-14. My review of the record indicates that Appellant's Cook County lawyers did not take even the most basic steps to ensure that their chosen strategy would be successful. The unreasonable conduct in this case lies not in the selection of a strategic direction, but rather in the effort (or lack thereof) to implement that strategy. A close look at the record will illustrate this point.[24]

---

[24]As the Appellant did not challenge the state habeas court's findings of fact, this court correctly afforded those findings of fact a presumption of correctness. However, the state habeas court's relevant findings of fact are rather unhelpful. While the court found that "preparation for the sentencing phase took place before trial, during trial, and during the recess between the guilt/innocence and sentencing phase of the trial," the court does not describe the nature or extent of that "preparation," and indeed, offers no specific examples of these alleged efforts. The state court's findings of fact tell us remarkably little about what actually occurred prior to and during the penalty phase of the trial. Given this absence of detailed, relevant factual findings, we carefully examine the record on appeal to see what, if anything, we learn about the actions of Appellant's counsel prior to and

First, a fair reading of the record demonstrates that there was remarkably little substantive preparation for the sentencing phase until very late in Appellant's trial. Davis's testimony, explaining his reasons for withdrawing from Appellant's Cook County legal team, is the first indication in the record that Appellant's attorneys were engaging in little planning for the sentencing phase prior to the trial.[25] The record is largely bereft of any specific references to actual preparation, as opposed to mere vague discussion, in the pretrial stages. Griner testified that, both pre-trial and during the trial, she "considered" putting on various witnesses at the sentencing phase, but her testimony was vague as to the substance of any discussions she had with her co-counsel about these witnesses. From her testimony, we can glean that counsel had at least developed some approximation of a sentencing phase strategy in the pretrial stage, though specific tactical decisions were not made at that time. Studstill's testimony indicated that he participated in general pretrial discussions about which witnesses to call at the sentencing phase, but he admitted that he did not himself interview or contact any prospective witnesses. His testimony further demonstrates that counsel's pretrial preparation

_____

during the sentencing phase of his case.

[25]Davis testified that Alderman and Griner believed Appellant was innocent, and thus did little to prepare for the sentencing hearing in the event that Appellant was found guilty.

was largely dedicated to considering and discussing various lines of defense at the sentencing phase, and not to making solid commitments about which witnesses to call or which specific arguments to advance. Alderman denied that there was any substantial preparation in the pretrial stage for the sentencing hearing.

Remarkably, the testimony of all three attorneys lends support to Appellant's claim that most of the substantive discussion of the sentencing phase took place during the forty-five minutes between the conclusion of the guilt phase and the jury's entry of a verdict. It was during this brief period that almost all of the relevant tactical decisions, such as which witnesses to call, appear to have been made. The failure to have this tactical discussion earlier helped ensure that there would be little time to enact it when the sentencing hearing came to pass, though Appellant's counsel likely thought they would have more time than they did. In fact, the verdict came forty five minutes after the jury retired, and the sentencing phase began almost immediately (within five minutes), catching Appellant's attorneys off-guard. Faced with this problem, Appellant's counsel inexplicably failed to seek a continuance after the verdict so that they could locate and prepare necessary sentencing phase witnesses.

This procrastination with respect to tactical planning led inexorably to counsel's inability to undertake the actions necessary to mount a credible

sentencing-phase defense.   For one thing, they failed to subpoena any witnesses to testify for the defense at the sentencing phase.  Alderman and Studstill admitted that they did not even attempt to contact any of the witnesses from the Lowndes County sentencing phase, or any other potential character witnesses, that did not happen to be present in the gallery at the Cook County trial.[26]  Griner claimed to have tried to contact a co-worker (presumably the co-worker that testified in Lowndes County), and one of Appellant's neighbors, but found these witnesses unavailable.[27]  Griner did not subpoena either of these witnesses, or apparently make any more than a cursory effort to secure their presence.   Not one of Appellant's three attorneys appear to have made any serious attempt to ensure that any of the valuable witnesses from Lowndes County, such as Appellant's co-

---

[26]Alderman, less than a year out of law school at the time, had never tried a criminal case of any kind before the Cook County trial.  Yet it was she who conducted the vast majority of Appellant's trial, examining every witness at both phases (excepting Appellant at the sentencing phase), making opening arguments at both the guilt and sentencing phases, and closing the sentencing phase. Alderman played far and away the most conspicuous role in Appellant's courtroom defense, a task likely to be overwhelming for any new attorney. The daunting task that she, an inexperienced lawyer,  faced in preparing for the conduct of the trial day to day, coupled with Studstill's absence for most of the trial, doubtless contributed to the lack of foresight in preparing or locating potential witnesses for the sentencing phase.

[27]This appears to be the only evidence in the record suggesting that Griner or others made an effort to ensure that any character witness would be present to testify at the Cook County proceeding.

worker and the prison guard with whom Appellant developed a friendship, were present in Cook County to provide similar testimony. In fact, the witnesses that ended up testifying for the defense at the sentencing phase were people, such as Appellant's sister and niece, that just happened to be present in the courtroom at the conclusion of the guilt phase of the trial. Griner admitted as much when she noted that each of the available witnesses she allegedly debated calling at the sentencing phase were all persons that were fortuitously present for the trial. If no one that could have attested to Appellant's character had happened to be present in the courtroom that day, Appellant might not have been able to present any character witnesses at the sentencing phase.

Secondly, the record clearly indicates that the attorneys did not attempt to prepare any of the witnesses that they eventually considered calling at the sentencing phase. All three attorneys admit that they made no pre-trial effort to interview and discuss the testimony that the potential witnesses were to give during the sentencing hearing. While Griner claimed that counsel talked to prospective sentencing phase witnesses during trial recesses, she admitted that there was no time to actually prepare witnesses for their testimony during the trial. Had the witnesses that ended up testifying been briefed on prospective questions, it is likely that the testimony would have formed a more coherent picture of Appellant's

60

character prior to the crime. Furthermore, it is likely that with reasonable pre-trial preparation, Appellant's wife and daughter (also present in the courtroom) would have been prepared for the possibility that their testimony would be necessary at a sentencing hearing. This would have made it less likely that they would have been "too upset" to testify after Appellant was found guilty. Indeed, Appellant's wife submitted an affidavit, expressing dismay at not being prepared or called as a witness at the Cook County trial.

Once again, this failure to secure and prepare witnesses for the sentencing phase is really not surprising, because there appears to have been almost no specific discussion of tactics prior to the forty-five minutes that separated the conclusion of the guilt phase from the sentencing phase. Of course there was no time to secure or prepare witnesses when the meaningful planning for the sentencing phase did not begin until less than an hour before the sentencing hearing began. Counsel's failure to consult one another and develop a coherent sentencing-phase strategy earlier, coupled with their inexcusable failure to seek a continuance after the verdict was read, led to significant and costly deficiencies in their sentencing phase presentation. The G.B.I. agent's testimony shed little light on Appellant's character, as the agent did not know Appellant and could only testify that Appellant's background file indicated that he had been consistently

employed.   Appellant's sister and niece offered useful (if unprepared) testimony concerning Appellant's positive background and genial relationships with his extended family.   However, this testimony was hardly a comprehensive portrait of Appellant's life and character.  Neither of these substantive character witnesses had lived with Appellant as an adult; neither knew anything about his non-familial relationships, and much of their testimony relied upon secondhand reports about his immediate family life.  The prosecutor capitalized on the distance in the relationship between the Appellant and his two significant character witnesses in his closing statement, where he noted that "[Appellant is] the kind of man who doesn't have a preacher to come and speak for him; a personal friend; a close, close family member."(emphasis added).[28]

Additional character witnesses were existent and available , and could have easily supplied testimony that would have developed a more comprehensive portrait of  Appellant's nature.[29]  This failure to put forward a credible mitigation

---

[28]The prosecutor had access to the Lowndes County transcript as well, so he had to know that Appellant did in fact have friends and close family members willing to speak on his behalf.  His comments about Appellant being friendless were questionable in light of this fact; however, Appellants' attorneys are squarely to blame for giving the prosecutor the opportunity to credibly make such a seemingly incorrect argument.

[29]The existence of additional character witnesses was apparent to Cook County counsel from the Lowndes County trial transcript.  In addition, the

case was not the result of any strategic choice; rather, it was the result of poor planning and a lack of reasonable effort.

Of course, when assessing counsel's performance, we do not ask whether counsel's decisions were strategic, but rather whether they were reasonable. *See Roe*, 528 U.S. at 481. Cook County counsel chose to present what they did; our inquiry must focus on whether that presentation might have been reasonable, given all of the circumstances. *See Chandler*, 218 F.3d at 1315 n.16.

Looking at what Appellant's attorneys actually did, I don't dispute that the general choice of the sentencing phase strategy (presenting evidence reflecting the pre-crime positive character and history of Appellant) was a reasonable one, especially in light of the success that strategy enjoyed at the Lowndes County proceeding. However, Appellant's lawyers did next to nothing to effect that strategy. They did not subpoena any witnesses, they did not prepare any of the witnesses that happened to be present, and they did not undertake any reasonable pre-trial effort to develop a coherent or comprehensive sentencing-phase presentation. They were amazingly lucky when they looked around the courtroom after the verdict was read and happened to locate two spectators that could provide

---

profusion of affidavits in the record suggests that additional character witnesses available could have been uncovered with any reasonable investigation.

63

some useful character testimony on Appellant's behalf.  Of course, this testimony was unprepared and easily refutable.  Due to their familiarity with the Lowndes County case, Appellant's lawyers knew that this defendant had a solid group of available character witnesses that could provide the sort of comprehensive character evidence they needed.  Yet they did nothing to secure this testimony.  No competent counsel would have done so little to ensure their client's survival.  This conduct fell well short of any set of professional norms, and should not be considered objectively reasonable under the first prong of *Strickland*.

The majority opinion, in finding this sort of conduct constitutionally acceptable, contradicts several authorities I find relevant to this case.  In *Collier v. Turpin*, we encountered analogous conduct on the part of defense counsel at the sentencing phase of a death penalty case.  In that case, defense counsel called ten witnesses to the stand, presumably to testify about the positive aspects of Collier's character, and the marked contrast between his overall character and his actions at the time of the crime.  The questions defense counsel asked elicited testimony suggesting that Collier "[H]ad a 'good' reputation, that he was generally known as a hard worker who took care of his family, and that he had a good reputation for truth and veracity." *Collier*, 177 F.3d at 1201.  However, counsel asked no questions about Collier's upbringing, his disposition, or specific instances in which his

generally positive character manifested itself.  Indeed, counsel's presentation tended to give the impression that the witnesses did not know Collier.  *Id*. The court concluded that counsel "presented almost none of the readily available evidence of Collier's background and character that would have led the jury to eschew the death penalty." *Id*.

The instant case is distinctly analogous to *Collier*.  My interpretation of our holding in *Collier* is the following: when defense attorneys have decided to pursue a mitigation case based on the positive character of the defendant, and testimony that would produce a beneficial picture of defendant's disposition is readily available, it is unreasonable not to make some effort to present a substantial portion of that testimony.  In this case, Appellant's attorneys clearly decided to present a mitigation strategy based upon Appellant's character.  Testimony that would have presented a comprehensive portrait of Appellant's life and character was readily available; in fact, counsel had a successful model, *i.e.* the Lowndes County transcript,  to use in preparing their mitigation case.  They did not present most of the available testimony because they elected not to try to locate or prepare any of the witnesses that would have made a mitigation case credible.  This, in my mind, is objectively unreasonable conduct that constitutes deficient performance under the first prong of the *Strickland* test.

Even more closely analogous to the facts of this case is the substance of the Supreme Court's holding in *Williams v. Taylor*. After Williams was convicted of murder, defense counsel put the defendant's mother and two neighbors on the witness stand. All three testified that the defendant was a "nice boy" and not a violent individual. Counsel also played the recorded voice of a psychiatrist that had examined Williams, who did little more than recount Williams's statement that he had once taken pains to avoid injuring bystanders in a robbery. Not surprisingly, Williams received a death sentence.

In Williams's case, there was ample, readily available evidence of situations in which Williams prior to his crime, had displayed admirable character, and there was also a large body of unexplored evidence of the difficulties of Williams's childhood. This evidence could have been discovered and used without much effort; in fact, Williams's counsel failed to return the telephone call from a prison ministry official who offered to testify that Williams thrived in a regimented environment and was proud of a carpentry degree earned in prison. However, Williams's counsel never uncovered much of this evidence, in part because they did not begin to prepare for the sentencing phase "until a week before the trial." *Williams*, 529 U.S. at 395. The Supreme Court found that Williams's attorney's

failure to secure this additional, readily available mitigation evidence "fell short of professional standards," and was unreasonable under the first prong of *Strickland*.

In the instant case, the conduct of Appellant's attorneys was even more deficient than the conduct found unacceptable in *Williams*. In *Williams*, additional, useful mitigation evidence, consistent with the strategy employed by Williams's counsel, went undiscovered due to counsel's unreasonable failure to investigate their client's background. In this case, Appellant's lawyers didn't even have to investigate Appellant's background and character; the Lowndes County transcript amounts to a ready-made mitigation case, completely consistent with the general strategy Cook County counsel wanted to pursue. Yet, because they didn't begin to seriously discuss tactics until forty-five minutes before the sentencing hearing began, they were unable to present anything more than a hollow shell of the Lowndes County mitigation case at the Cook County trial. The conduct of Williams's attorneys looks diligent by comparison. The actions Appellant's attorneys took cannot and should not be rationalized as objectively reasonable under current authority, and the state habeas court unreasonably applied federal law when it made that finding.

<u>Prejudice</u>

67

The majority correctly points out that the aggravating factors present in the Cook County case exceeded those that were presented at the Lowndes County trial. This reality makes it somewhat more difficult for Appellant to demonstrate that he was prejudiced by his attorneys' unreasonable conduct. Nonetheless, but for counsel's unreasonable failure to present a credible mitigation case, there is a reasonable probability that Appellant's sentence would have been different.

The majority claims that the distinction between the mitigation cases put forward by Appellant's counsel at the two trials is merely a matter of quantity, differing "only in its volume, not in its substance." This argument suggests that the mitigation case presented in Cook County was substantially similar to the case presented in Lowndes County, and that neither presentation would have changed the outcome. I disagree. The substance of the testimony presented at the Lowndes County trial was considerably stronger than that presented in Cook County, and the weakness of the Cook County testimony likely affected the outcome of that sentencing hearing.

As a general matter, the introduction of character evidence is most useful when it presents an image of the defendant as a whole person, shedding light on positive aspects of the defendant's life in varied contexts. A central purpose of presenting positive character evidence is to emphasize the sharp distinction between

the defendant's overall character and reputation and the defendant's criminal conduct. To do this successfully, defense counsel must present a comprehensive picture of the defendant's life and character, so that a jury can consider many of the defendant's relevant relationships and actions, such as his relationships with his family (both immediate and extended), friends, co-workers, and other close acquaintances. When evidence of a defendant's positive character comes from only one source, the jury is naturally likely to accord it less weight, as it represents merely a fraction of the defendant's overall identity. Character evidence is not easily dismissed when it comes from a variety of sources, shedding light on a variety of the defendant's relationships, and when it presents a comprehensive picture of a defendant's life and character.

Often, testimony presenting a comprehensive view of a defendant's character is unavailable. Many criminal defendants lack the breadth and variety of the close relationships that Appellant had prior to his crimes, and thus any character evidence presented at the penalty phase is necessarily incomplete. However, when testimony reflecting defendant's character from a variety of angles is available, as it clearly was in the instant case, it is far more powerful than character testimony from one or two sources.

69

In this case, Appellant's counsel presented a constricted and grossly incomplete view of Appellant's character and relationships. Appellant's niece and sister, useful as their testimony may have been, could only shed light on one of Appellant's relationships, and his character with respect to those relationships. If counsel had presented the Lowndes County mitigation case, the jury would have had a much more comprehensive, nuanced, and textured view of Appellant.

The prosecutor understood this, and pounced on the distinction between the mitigation cases presented at the two trials. In his closing statement, the prosecutor thundered that the most important piece of information to come to light during the penalty phase was the fact that the jury didn't hear from Appellant's wife, a close friend, or a close family member. The prosecutor concluded his opportunistic remarks with the statement:

> [Appellant is] the sort of man that doesn't have a preacher to come and speak for him, a personal friend, a close, close family member. So, I say to you that tells you <u>more than anything else you've heard in three days about the man</u>. (emphasis added).

The prosecutor's closing remarks thus placed remarkably strong emphasis on the significance of the weaknesses in Appellant's presentation; the very weaknesses that would have been rebutted had Appellant's attorneys performed reasonably. The Lowndes County presentation would have prevented the prosecutor from

credibly making the (incorrect) argument that Appellant was the sort of man that lacked close, loving, positive relationships with others. The fact that the prosecutor so dramatically emphasized the importance of the weaknesses in the Appellant's presentation ("[T]hat tells you more than anything you've heard in three days about the man.") illustrates just how prejudicial the omission of relevant evidence was.

The character testimony that was presented in Cook County failed to provide the jury with anything other than an incomplete picture of the Appellant's overall character. This lack of relevant character testimony made the jury's task much easier, as they could readily accept the prosecutor's claim that Appellant had no close relationships, and his fate should be adjudicated solely by reference to his crime. Had Appellant presented the readily available character evidence that would have provided a comprehensive picture of Appellant's life, the jury's task would have been more difficult. With sufficient evidence of Appellant's positive character, the jury would have been faced with the same challenge the Lowndes County jury confronted, namely weighing a lifetime of positive relationships and achievement against the horrific nature of the crime. No one can say with certainty how the jury would have decided had this additional testimony been presented. However, I can say with certainty that I cannot have confidence in the jury's decision when it was made on the basis of so incomplete a presentation of one side

of the ledger. The jury's verdict was rendered without its consideration of highly relevant information, and there is a reasonable probability that the jury's decision would have been different had it been privy to this information. For this reason, the Appellant has successfully demonstrated that he was prejudiced by his attorneys' unreasonable performance.

## Conclusion

In conclusion, several salient and troubling facts about this case should be reemphasized. Appellant's Cook County attorneys had the transcript of the Lowndes County sentencing hearing at their disposal to use in preparing Appellant's sentencing phase strategy. This transcript is nothing less than an instruction manual for how to put together a successful portrait of Appellant as a person whose actions on the night of the crime stand in sharp contrast to the person that he was prior to and after the crime. Indeed, Appellant's attorneys reasonably decided to pursue the same general strategy at the Cook County case. Yet they neither subpoenaed, prepared, nor took any steps to ensure that any of the witnesses that testified at the Lowndes County trial would be available and ready to testify in Cook County. In fact, if Appellant's niece and sister hadn't happened to be in the gallery that day, Cook County counsel might not have been able to put on any relevant character witnesses at the sentencing phase. If this performance is

rationalized as something a reasonable attorney might have done, we have rendered the word "reasonable" meaningless.

Given the unreasonable omission of relevant and available character evidence during the penalty phase of this case, the integrity of the death verdict is suspect. Appellant is likely on death row today because of the deficient performance by his attorneys at the sentencing phase of this case. I respectfully dissent.